UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

PRINCE OF PEACE ENTERPRISES, INC..
                      Plaintiff,

              -against-.

TOP QUALITY FOOD MARKET, LLC, et al

                  Defendants
-------------------------------------------------------------------X

2007 Civ. 0349 (RJH)

## MEMORANDUM IN OPPOSITION TO PRELIMINARY INJUNCTION AND TO CONFIRMATION OF ORDER OF SEIZURE

**Snow Becker Krauss, P.C.**
**Attorneys for Defendant**
**Top Quality Food Market, LLC**
**605 Third Avenue**
**New York, NY 10158**
**(212) 687-0326**

## INTRODUCTION

Defendant, Top Quality Food Market LLC ("Top Quality") is filing this memorandum in opposition to the motion of plaintiff for a preliminary injunction and to confirmation of the order of seizure issued by this Court on January 16, 2004.

## FACTS

Plaintiff, Prince of Peace Enterprises, Inc. ("POP")  commenced this action by filing the complaint on January 16, 2007.  The complaint alleges that Top Quality and three other defendants sold products identified as "Po Chai Pills" in violation of the rights of plaintiff under the Lanham Act, 15 U.S.C. § 1111, et seq. , and related state and common law doctrines of unfair competition.  At the same time, plaintiff obtained an  order of seizure for the accused pills from the retail premises of Top Quality and the other defendants pursuant to 15 U.S.C. Section 1116(d).

The complaint further alleges that POP  is the assignee of certain trademarks used to identify Po Chai Pills in the United States and is the exclusive distributor in the United States of Po Chai Pills and that Top Quality sold products infringing its rights in Po Chai Pills.

Top Quality is a New Jersey limited liability company which carries on a retail grocery business at its only place of business in Parsippany, New Jersey.  It was served with the summons and complaint at its store in Parsippany on Sunday, January 28, 2007. (Huang Aff. ¶¶ 2,3).

Top Quality does not conduct any business in New York State. All of its business activities, including those related to sales of Po Chai Pills, are conducted in New Jersey. (Huang Aff. , ¶3 ).

The Po Chai Pills offered for sale by Top Quality were obtained from Madison

1

One Acme, Inc., doing business as Solstice Medicine Company ("Madison One"). Madison One

obtained the Po Chai Pills on August 18, 2004 from Mega Care Pharmaceutical (Holdings) Ltd.

("Megacare") , a Hong Kong company which had purchased the pills from their manufacturer, Li

Chung Shing Tong (S) PTE Ltd, ("LCST"), which also authorized Megacare  to sell the Po Chai

Pills to Madison One. (Phillip So Aff., ¶¶ 4-7).

POP has not demonstrated any material differences between the Po Chai Pills sold

by Top Quality and those sold by POP.

On September 18, 2007, Po Yuen wrote to Top Quality accusing it of selling Po

Chai Pills "not purchased from POP ..... the only authorized importer and distributor of Po Chai

Pills in the United States of America." (Huang Ex. P. 1).The letter did not complain that the

trademarks of POP or anybody else were being infringed., only that they did not come from an

authorized source.

### SUMMARY OF ARGUMENT

This Court does not have personal jurisdiction over defendant Top Quality, which

is conclusive as to any grant of relief against it.  Assuming the Court does have personal

jurisdiction over Top Quality, POP has not shown that it is entitled to any relief.

The products were not counterfeit so POP was not entitled to an order of seizure.

The products are genuine goods made by the same manufacturer as those sold by

POP and do not infringe any trademarks used by POP.

POP does not have an assignment from the registrant, either LCST or Quinwood,

and lacks standing to pursue any claim for federal trademark infringement or obtain an order of

seizure.

**ARGUMENT**

**I.    THIS COURT LACKS PERSONAL JURISDICTION OVER TOP QUALITY BECAUSE IT WAS NOT SERVED PURSUANT TO FRCP 4(k).**

In its complaint, POP alleges at paragraph 3:

This Court has personal jurisdiction over defendant Top Quality Food Market, LLC ("Top Quality") because its principal place of business is located in Parsippany, NJ, within 100 miles of the courthouse.

The only provision for jurisdiction based on a distance of less than 100 miles from the courthouse is Fed R. Civ. Pro 4(k)(1)(B), applicable when the party being served is joined under Rule 14, Third-Party Practice, or Rule 19 , Joinder of Persons Needed for Just Adjudication. [1] Service pursuant to the  "bulge" jurisdiction of Rule 4 is "authorized only where the necessary party is brought in as an *additional party"* to a *pending* action." Roscoe-Ajax Construction Co. v. Columbia Accoustics and Fireproofing Co. , 39 F.R.D. 608 (S.D.N.Y. 1966); see also, Leroy White and Patricia White v. Leopold Diamond, 390 F. Supp. 867, 869 (D. Md. 1974).  Top Qualtiy being an original party to this action, the 100 mile bulge jurisdiction is not available to POP here.

POP does not suggest any other basis for service of Top Quality in New Jersey.

---

[1]Rule 4(k) of the Federal Rules of Civil Procedure provides :  (k) Territorial Limits of Effective Service. (1) Service of a summons or filing a waiver of service is effective to establish jurisdiction over the person of a defendant (A) who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located, or (B) who is a party joined under Rule 14 or Rule 19 and is served at a place within a judicial district of the United States and not more than 100 miles from the place from which the summons issues, or (C) who is subject to the federal interpleader jurisdiction under 28 U.S.C. § 1335, or (D) when authorized by a statute of the United States. (2) If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

The only possibility suggested by Rule 4(k) is that Top Quality is a party that "could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located," Fed. R. Civ. P. 4(k)(1)(A). The New York Supreme Court can obtain jurisdiction by services of parties out of the state only through the authority of CPLR 301 (doing business) or CPLR 302 (long arm jurisdiction). However, the complaint makes allegations of facts by which either of these could confer jurisdiction. The nature of Top Quality's business, a single retail store in New Jersey, does not in any way suggest that it is "doing business" in New York within the meaning of CPLR 301 and the complaint contains no allegation that addresses any of the jurisdictional possibilities of CPLR 302. The affidavits submitted in support of the seizure order do not describe any contact by Top Quality other than at its store in New Jersey, where POP's investigator purchased the "Po Chai Pills"  and the affidavit of Bor Wen Huang confirms that its only actions relating to Po Chai Pills were in New Jersey.

POP has not  shown any basis whereby this Court might have personal jurisdiction over Top Quality.

The Court lacks the personal  jurisdictional over Top Quality required to issue a temporary injuncton addressed to  Top Quality and the motion for a temporary injunction should be denied as to Top Quality. For the same reason, the order of seizure should be vacated.

## II. PLAINTIFF DOES NOT OWN THE TRADEMARKS AND HAS NO STANDING TO ALLEGE TRADEMARK INFRINGEMENT, DILUTION AND/OR COUNTERFEITING.

Only the owner of a trademark can sue for trademark infringement and/or dilution under the Lanham Act. As the highly regarded and oft-cited trademark treatise by McCarthy explains:

> "If plaintiff is the owner of a federal mark registration, it may sue in federal court for infringement of that registered mark....[I]t is clear that plaintiff must allege that it is in fact the "registrant" of an already issued and outstanding registration. *Only the federal "registrant" has standing to sue under Lanham Act Sec. 32(1)*."

6 McCarthy on Trademark and Unfair Competition § 32:3, at 32-14 (2006). (Cited pages included in Appendix to this memorandum).

Plaintiff in this case is not the owner of the trademarks pleaded in the Complaint ("Trademarks"). The document that Plaintiff claims to be an "assignment," is not an assignment. It is just a simple letter granting exclusive use of, and enforcement rights to, various trademarks in the United States. ("LCST grants POP the Sole and Exclusive use of various Quinwood Limited Trademarks owned by LCST...to take any and all actions against any and all parties...") Unlike an assignment, which is an irrevocable transfer of rights, the letter (Exh. A to the Declaration of Rick Wong) explicity allows LCST to terminate the license ("[T]his grant shall remain valid until terminated by written notice to the Trademark Office").

A valid trademark assignment must also, without exception, assign the goodwill of the business associated with the trademark. An assignment without good will, known as an assignment "in gross," does not transfer any legal rights to the assignee. The letter assigns no such good will and makes Plaintiff, at best, a licensee who, under the Lanham Act, cannot bring suit. See, e.g., 1 J. Gilson, Trademark Protection and Practice §3.06[1] at 3-140.40 (2006). (Cited pages included in Appendix).

Plaintiff cannot now cure this fatal defect of not being the trademark owner. The

5

law requires plaintiff to have been the trademark owner at the time it filed the present lawsuit. A

later *nunc pro tunc* assignment will not be sufficient to correct the deficiency. 6 McCarthy on

Trademark and Unfair Competition § 32:3, at 32-15 (2006). (Cited pages in appendix).

   With respect to its claim for trademark dilution, Plaintiff also has no standing to

sue for that cause of action. The dilution statute under Lanham Act Sec 43(a) is limited to "the

owner of a famous mark." A licensee of a mark such as plaintiff has no standing to sue under the

federal anti-dilution law. *Id.; see also,* <u>STX, Inc. v Bauer USA, Inc.</u>, 43 U.S.P.Q.2d 1492, 1495-

96 (N.D. Cal. 1997).

   Plaintiff also lacks standing to assert a cause of action for counterfeiting. The

anti-counterfeiting statute plainly states that it only applies in actions for trademark infringement

arising under Section 32(1)(a) of the Lanham Act (e.g. trademark infringement based on a

registered trademark). 35 U.S.C. 34(d) ("In the case of a civil action arising under section

32(1)(a) of this Act (15 U.S.C.A. 1114)...the court may...grant an order...providing for the

seizure of goods"). As discussed *supra*, Plaintiff cannot bring a trademark infringement action

under Section 32(1)(a) because plaintiff does not own the trademarks. Under 35 U.S.C. 34(d),

Plaintiff had no standing to petition *ex parte* for a seizure order, and the Court had no power to

order the seizure.

   To conclude, as plaintiff is not the owner of the Trademarks, and since the true

owner of the marks is not a plaintiff in this action, the Court should promptly dismiss at least

Counts I (Federal Trademark Infringement) and III (Federal Trademark Dilution) of Plaintiff's

complaint. Further, since Plaintiff has no standing to allege counterfeiting under the Lanham

Act, the Court should rescind the Seizure Order and refuse to enter a Preliminary Injunction.

The Court should also order Plaintiff to compensate defendants for the damages Plaintiff inflicted on defendants as a result of the improper seizure. These damages include, among other things, lost sales while the stores were closed during the seizures. Defendants also deserve compensation for the attorneys fees and costs incurred as a result of the improper seizures. Waco Int'l, Inc. v. KHK Scaffolding Houston, Inc., 278 F.3d 523 (5th Cir. 2002). (. Congress indicated that a seizure may be wrongful: (1) where an applicant acted in "bad faith" in seeking the order; or (2) if the goods seized are predominately legitimate merchandise, even if the plaintiff acted in good faith).

### III. THE GOODS SOLD BY DEFENDANTS TOP QUALITY, A&C SUPERMARKET AND FAVOR FOOD ARE LEGAL PARALLEL IMPORTS

Turning now to the goods, they are not counterfeit goods, at least with respect to the pills sold by Defendants Top Quality, A&C Supermarket, and Favor Food, all of which sold the pills in packaging that indicated the pills were distributed by Madison One Acme, Inc. (Exhibits A-C of of Wai Hing Lee Wong Aff.). These are parallel imports legally available in this country. Imports of parallel goods that are not materially different are not trademark infringements, and do not violate Section 43(a), as they do not deceive consumers as to source. See 5 McCarthy on Trademark and Unfair Competition § 29:51.2, at 29-136 (2006)("[I]f the authorized and the gray market imports are substantially the same, unless the designated U.S. importer can prove a likelihood of confusion by some other method, Lanham Act confusion remedies are no bar to importation."); *Wiel Ceramics & Glass, Inc. v. Dash*, 878 F.2d 659 (3rd Cir. 1989)("Consumers who purchase [gray market] ...porcelain get precisely what they believed that they were purchasing."; therefore the authorized importer's reputation is not impaired

because its good will is "not diminishedby an association with goods of a lesser quality").

In this respect, the Declaration of P. Wong is highly and inexcusably misleading. Mr. Wong compares only one package, sold by only one of the defendants in this action, W.J. Inc., to the packaging of POP. The packaging of W.J. Inc. is different than the packaging sold by the other three defendants. W.J.'s packaging does not, like that of the others, indicate that the distributor is Madison One Acme, Inc. Instead, they sold the packaging of Exhibits A-C of Wai Hing Lee Wong which, when compared to Pop's packaging, is essentially the same. The packages sold by Defendants Top Quality, A&C and Favor Food all bear the same graphics and indicia, list the weight and ingrediants, and comply with the FDA regulations to the same extent as the POP packages.

The pills sold by Defendants Top Quality, A&C and Favor Food are the same pills, manufactured by the same Chinese manufacturer, as the pills sold by Plaintiff POP. As verified by the affidavit of Phillip So, filed herewith, the owner of the trademark, LCST, manufactured the pills and sold them to business run by a former executive of LCST, which then sold the pills to Madison One Acme, Inc. Madison then resold the pills to Defendants Top Quality, A&C, and Favor Food. Madison One Acme, Inc. is working to obtain a declaration from the former executive of LCST who purchased the pills from LCST, but due to the very short time frame in preparing these papers, has not been able to do so and will file the declaration with the Court as soon as it is available.

In any event, Defendants Top Quality, A&C, and Favor Food sold the same pills in the U. S. as Plaintiff POP, in packaging that is essentially the same as the packaging imported and sold by plaintiff POP. Consequently, the Lanham Act confusion remedies do not apply. The goods sold by these defendants are completely legal under the Trademark Laws. Moreover, the

8

goods sold by these defendants were surely not counterfeit as defined in 15 U.S.C. Section 1116(d)(2)(B). That section specifically provides that the term "counterfeit goods" "does not include any mark or designation used on or in connection with goods and services of which the manufacturer or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured." 15 U.S.C. Section 1116(d)(1)(B). These goods came from a manufacturer authorized to use the mark, the manufacturer supplying POP. Moreover, the letter from POP's attorney of September 18, 2006 makes clear that POP's only complaint is that the goods do not come from the supposedly only authorzied source, POP, not that they are infringing any trademark. (Haung Aff., Ex. 1). Indeed, the complaint is careful to describe them as "unauthorized" rather than "infringing."

POP's memorandum is predicated on the supposition that the products sold by Top Quality were manufactured by someone other than LCST and that it can demonstrate likelihood of success by reiterating the <u>Polaroid</u> formula and demonstrating likelihood of confusion, etc. Because, as explained above, the goods were manufactured by LCST, which was authorized to use the marks, POP's memorandum is irrelevant to any of the issues before the Court, except, perhaps, the necessity of showing some likelihood of success on the merits. POP has shown none.

**CONCLUSION**

This Court should deny the motion for a preliminary injunction and vacate the seizure order as to Top Quality because the Court lacks personal jurisdiction over Top Quality. In the alternative, this Court should deny the motion for a preliminary injunction and vacate the order of seizure because the plaintiff has shown no likelihood of success on the merits, it lacks standing in any event, and the goods are not counterfeit.

Respectfully Submitted,

Snow Becker Krauss

By   s/ James N. Blair JB 6745
605 Third Avenue
New York, NY 10158
(212) 687-3860

**APPENDIX**

*Intellectual Property Library*

# McCarthy on Trademarks and Unfair Competition

J. Thomas McCarthy
Fourth Edition

Volume 5



**THOMSON**

**WEST**

*For Customer Assistance Call 1-800-328-4880*

© 2006 Thomson/West, Rel. 40, 12/2006
Mat #40398788

§ 29:51.2                                    McCarthy on Trademarks

***Different Language Labeling and Warranty Coverage as "Material Differences".*** Some courts have held that when the grey goods have product labelling that is not in English, this constitutes a sufficient "material difference" in combination with other differences.[20]

Some courts have held that a branded parallel imported product with warranty protection inferior to that of the authorized imports constitutes a non-conforming material difference lacking the trademark owner's quality control.[20.1]

***Lack of "Material Differences" Between the Goods.*** But if the authorized and the gray market imports are substantially the same, unless the designated U.S. importer can prove a likelihood of confusion by some other method, Lanham Act confusion remedies are no bar to importation. The Third Circuit observed that where the authorized

---

*Contra:* Phillip Morris Inc. v. Cigarettes for Less, 69 F. Supp. 2d 1181, 52 U.S.P.Q.2d 1266 (N.D. Cal. 1999), aff'd, 215 F.3d 1333 (9th Cir. 2000) (Ninth Circuit rule precludes recovery if there is "common control" over the domestic and export cigarettes. However, court did require disclosure that export cigarettes have no merchandise redemption.)

[20]*See, e.g.,* Original Appalachian Artworks, Inc. v. Granada Electronics, Inc., 816 F.2d 68, 73, 2 U.S.P.Q.2d 1343 (2d Cir. 1987) (Spanish-language "adoption" papers and "birth" certificates with Spanish-made CABBAGE PATCH dolls constituted a material difference together with fact that the Spanish dolls would not be accepted into the U.S. "adoption" system); PepsiCo, Inc. v. Nostalgia Products Corp., 18 U.S.P.Q.2d 1404 (N.D. Ill. 1990) (Mexican PEPSI-COLA bottles were in Spanish and did not contain list of ingredients; consent decree.); Helene Curtis v. National Wholesale Liquidators, Inc., 890 F. Supp. 152 (E.D.N.Y. 1995) (gray market Canadian-made hair care products were labelled in French as well as in English and listed quantity in metric and did not contain list of ingredients required by U.S. law; along with formulation variations, these labelling dissimilarities constituted a "material difference"); PepsiCo Inc. v. Reyes, 50 U.S.P.Q.2d 1696 (C.D. Cal. 1999) (Spanish language labels on Mexican-made PEPSI-COLA, in addition to differences in packaging, marketing and quality control; consent decree); Gamut Trading Co. v. U.S. Intern. Trade Com'n, 200 F.3d 775, 53 U.S.P.Q.2d 1261 (Fed. Cir. 1999).

[20.1]Perkins School for the Blind v. Maxi-Aids, Inc., 274 F. Supp. 2d 319, 69 U.S.P.Q.2d 1932 (E.D. N.Y. 2003) ("Put simply, a distribution of non-conforming products may constitute trademark infringement."). *See:*Osawa & Co. v. B & H Photo, 589 F. Supp. 1163, 1168, 6 Int'l Trade Re. 1124, 223 U.S.P.Q. 124, 130 (S.D. N.Y. 1984) ("It seems to me a significant equitable factor that defendants could also have undertaken to warn their customers that their merchandise was not imported by the authorized U.S. Mamiya distributor and carried no warranty protection. Instead the opposite has been done.").

imports and the parallel imports are not "materially different," the confusion rationale of *Original Appalachian* does not apply and § 32 does not bar parallel imports: "Consumers who purchase [gray market] imported LLADRO porcelain get precisely what they believed that they were purchasing."[21]

Similarly, the Third Circuit held that the trademark owner's superficial inspection of the packaging of authorized imports of household cleaner did not suffice to create a "material difference" between authorized inspected imports and unauthorized uninspected imports which both emanated from the same manufacturer. "[The trademark owner's] 'hands off' approach has reduced its quality control inspection to a *de minimis* check designed to make sure that the products it receives from [the manufacturer] are not obviously unmarketable."[22]

The federal court in Los Angeles held that re-imported non-prescription health care products were not "materially different" from the mere fact that the goods were shipped from the U.S. abroad and then imported back into the United States. These goods were manufactured for the U.S. market, found acceptable by F.D.A. inspectors, were not damaged in transit and were still packed in their original shrink-wrapped plastic.[23]

***Corporate Affiliation.*** Other courts place some weight on whether the designated U.S. importer and the foreign manufacturer are independent or have a corporate

---

[21]Weil Ceramics & Glass, Inc. v. Dash, 878 F.2d 659, 11 U.S.P.Q.2d 1001 (3d Cir. 1989) (therefore, the authorized importer's reputation is not impaired because its good will is "not diminished by an association with goods of a lesser quality").

[22]Iberia Foods Corp. v. Romeo, 150 F.3d 298, 47 U.S.P.Q.2d 1604 (3d Cir. 1998)(the trademark owner could not inspect the contents of the cleaner because it had no knowledge as to its contents or ingredients. "By limiting its inspection to 'self-evident' defects, [the trademark owner] does no more than weed out those bottles of MISTOLIN that are entirely unsaleable on the open market.").

[23]American Home Products v. Reliance Trading Co., 55 U.S.P.Q.2d 1756, 2000 WL 1263465 (C.D. Cal. 2000) ("Absent a reason to believe something happened in the course of overseas shipping, the court does not find such shipping to create a material difference.").

affiliation.[24] This is the view of the Ninth Circuit, which will find no violation if the genuine and grey market goods come from a common source, regardless of whether there are material differences in the goods.[25] The better view is that while corporate affiliation is relevant, it is not determinative.[26] As the Restatement notes, it may be easier for an independent designated U.S. importer to establish itself as a separate source of good will identified by the mark than a wholly owned subsidiary of the foreign manufacturer.[27]

**The "Exhaustion Rule" is No Defense.** Under the "first

---

[24]*See* NEC Electronics v. CAL Circuit Abco, 810 F.2d 1506, 1 U.S.P.Q.2d 2056 (9th Cir. 1987) (When the trademark owner in the United States is a wholly-owned and controlled subsidiary of the foreign manufacturer, the grey goods are not infringing. "Trademark law generally does not reach the sale of genuine goods bearing a true mark even though such sale is without the mark owner's consent. . . . This country's trademark law does not offer NEC-Japan a vehicle for establishing a worldwide discriminatory pricing scheme simply through the expedient of setting up an American subsidiary with nominal title to the mark.").

[25]Phillip Morris Inc. v. Cigarettes for Less, 69 F. Supp. 2d 1181, 52 U.S.P.Q.2d 1266 (N.D. Cal. 1999), aff'd, 215 F.3d 1333 (9th Cir. 2000) ("[T]he determination of genuineness in *NEC* revolved largely around the fact that NEC-Japan and NEC-USA were under common control such that the importer was not 'selling goods of one make under the trademark of another.'").

[26]Lever Bros. Co. v. U.S., 877 F.2d 101, 11 Int'l Trade Re. 1346, 11 U.S.P.Q.2d 1117 (D.C. Cir. 1989) on remand to, 796 F. Supp. 1, 1414 Int'l Trade Re. 1630, 24 U.S.P.Q.2d 1297 (D.D.C. 1992), aff'd in part, vacated in part on other grounds, 981 F.2d 1330, 15 Int'l Trade Re. 1065, 25 U.S.P.Q.2d 1579 (D.C. Cir. 1993) ("[W]hen identical trademarks have acquired different meanings in different countries, one who imports the foreign version to sell it under that trademark will (in the absence of some specially differentiating feature) cause the confusion Congress sought to avoid. The fact of affiliation between the producers in no way reduces the probability of that confusion; it is certainly not a constructive consent to importation."). *See* discussion in

[27]Restatement (Third) of Unfair Competition § 24, comment f (1995) ("The wide range of possible relationships between the domestic trademark owner and the foreign manufacturer, however, cautions against the formulation of a rule based on affiliation alone."). *See* Yamaha Corp. of America v. United States, 961 F.2d 245, 22 U.S.P.Q.2d 1417, 1428 (D.C. Cir. 1992), cert. denied, 506 U.S. 1078, 122 L. Ed. 2d 353, 113 S. Ct. 1044 (1993) (rejecting claim that the Paris Convention is violated because a company is discriminated against because it is a wholly owned subsidiary of a foreign corporation; all domestic U.S. companies that share common ownership with an owner of the foreign trademark (whether that owner is domestic or foreign) are placed on an equal basis).

*Intellectual Property Library*

# McCarthy on Trademarks and Unfair Competition

J. Thomas McCarthy
Fourth Edition

Volume 6



**THOMSON**

**WEST**

*For Customer Assistance Call 1-800-328-4880*

© 2006 Thomson/West, Rel. 40, 12/2006

Mat #40398788

ity to sue for trademark infringement under federal law.[8]

Federal question jurisdiction in the federal courts is created in various types of suits brought under the Lanham Act as indicated in the following subsections.

### § 32:3   Federal question jurisdiction—Infringement in interstate or foreign commerce of federally registered mark—Only registrant can sue

If plaintiff is the owner of a federal mark registration, it may sue in federal court for infringement of that registered mark.[1] Since the statute states that infringement consists of use in interstate commerce "without the consent of the *registrant*," and that the infringer "shall be liable in a civil action by the *registrant*," it is clear that plaintiff must allege that it is in fact the "registrant" of an already issued and outstanding registration. Only the federal "registrant" has standing to sue under Lanham Act § 32(1).[2]

---

[8]Committee for Idaho's High Desert v. Yost, 92 F.3d 814, 39 U.S.P.Q.2d 1705 (9th Cir. 1996) (Fed. R. Civ. P. 17(b)(1) permits an "unincorporated association" to sue in federal court to enforce federal law regardless of its capacity to sue under the law of the state).

**[Section 32:3]**

[1]Lanham Act § 32(1), 15 U.S.C.A. § 1114(1). *See* § 23:76.

[2]Quabaug Rubber Co. v. Fabiano Shoe Co., 567 F.2d 154, 195 U.S.P.Q. 689 (1st Cir. 1977); DEP Corp. v. Interstate Cigar Co., 622 F.2d 621, 206 U.S.P.Q. 673 (2d Cir. 1980); Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Co., 592 F. Supp. 127, 222 U.S.P.Q. 229 (E.D. Pa. 1984) (Only a registrant can sue for the remedies provided in the Lanham Act. Registrant cannot recover Lanham Act damages for acts which took place before the registration issued.); Berni v. International Gourmet Restaurants, Inc., 838 F.2d 642, 5 U.S.P.Q.2d 1723, 1725 (2d Cir. 1988) (Lanham Act § 32 grants standing to assert a claim for trademark infringement "solely to the 'registrant.' Under the Act, that term includes the registrant and its 'legal representatives, predecessors, successors and assigns.' *Id.* at § 1127."); Gruen Marketing Corp. v. Benrus Watch Co., 955 F. Supp. 979, 982 (N.D. Ill. 1997) (exclusive licensee does not have standing to sue under § 32(1) for infringement of the licensed registered mark); Nordco A.S. v. Ledes, 44 U.S.P.Q.2d 1220 (S.D.N.Y. 1997) ("[O]nly the registrant of a trademark and its legal representative, predecessors, successors and assigns have standing to bring a § 32 action."); Finance Investment Co. (Bermuda) Ltd. v. Geberit AG, 165 F.3d 526, 49 U.S.P.Q.2d 1289 (7th Cir. 1998) (distributors have no standing to allege a claim of violation of § 32(1)).

*See* Chemical Corp. of America v. Anheuser-Busch, Inc., 306 F.2d

Similarly, standing to sue for a claim of federal dilution under Lanham Act § 43(a) is limited to "the owner of a famous mark." Thus, an exclusive licensee of a mark has no standing to sue under the federal anti-dilution law.[3]

This is not to say that if the plaintiff does not have a federal registration, that it cannot file suit in federal court. A trademark owner can sue in federal court for infringement of an unregistered mark, tradename or trade dress under Lanham Act § 43(a).[4]

Only the owner of the trademark is entitled to sue for its infringement. If plaintiff was not the owner of the trademark at the time that suit was filed, a later nunc pro tunc assignment is not sufficient to correct the deficiency.[5]

### § 32:4   Federal question jurisdiction—Infringement in interstate or foreign commerce of federally registered mark—Suit must be directly based on infringement of registration

The mere incidental presence of a federal trademark registration in a controversy does not give rise to federal jurisdiction because the case does not "arise" under the Lanham Act.[1] If the owner of a federal trademark registration who is a licensor alleges that the licensee has merely

---

433, 134 U.S.P.Q. 524, (5th Cir. 1962), cert. denied, 372 U.S. 965, 10 L. Ed. 2d 129, 83 S. Ct. 1089, 137 U.S.P.Q. 913 (1963) (even though no federal registration is issued prior to filing suit, a subsequently obtained registration is in issue where plaintiff amended the complaint prior to trial to allege its existence); Gemeinde Brau, Inc. v. Amana Soc'y, 557 F.2d 638, 195 U.S.P.Q. 145 (8th Cir. 1977), cert. denied, 434 U.S. 967, 54 L. Ed. 2d 454, 98 S. Ct. 511, 196 U.S.P.Q. 144 (1977) (it is proper for two parties, each holding registrations of the same mark for different goods, to institute a joint suit for infringement); §§ 18:79-18:81.

[3]STX, Inc. v. Bauer USA, Inc., 43 U.S.P.Q.2d 1492, 1495-96 (N.D. Cal. 1997).

[4]See § 32:11.

[5]Gaia Technologies, Inc. v. Reconversion Technologies, Inc., 93 F.3d 774, 41 U.S.P.Q.2d 1134 (Fed. Cir. 1996), later proceedings, Gaia Technologies Inc. v. Recycled Products Corp., 175 F.3d 365, 50 U.S.P.Q.2d 1830 (5th Cir. 1999) (plaintiff was not the owner of the trademark at the time it filed suit and thus cannot prove infringement under Texas law).

[Section 32:4]

[1]See Postal Instant Press v. Clark, 741 F.2d 256, 223 U.S.P.Q. 281 (9th Cir. 1984) (where franchisor-registrant of mark sued ex-franchisee to

§ 32:4                                      McCarthy on Trademarks

breached the license, there is no federal jurisdiction. But if the licensor also alleges infringement by the licensee on the ground that the license has already been terminated, then there is federal jurisdiction.[2]

The Eleventh Circuit held that plaintiff's claim of breach of contract to purchase plaintiff's federally registered trademark did not create a federal question sufficient to support removal from state to federal court.[2.50]

In the Second Circuit, if the face of the complaint reveals that plaintiff alleges a violation of the Lanham Act and seeks relief provided by that law, then the case "arises under" the Lanham Act, even if the dispute is created by a disruption of a contract.[3]

---

enforce a non-competition clause in the franchise agreement, federal court does not have jurisdiction merely because of the incidental presence of a registered mark); Hamilton v. Hertz Corp., 607 F. Supp. 1371, 227 U.S.P.Q. 161 (S.D.N.Y. 1985) (the mere mention of a federally registered mark in a complaint for personal injuries does not create a federal issue sufficient to support removal to federal court).

[2]Foxrun Workshop, Ltd. v. Klone Mfg., Inc., 686 F. Supp. 86, 7 U.S.P.Q.2d 1655 (S.D.N.Y. 1988) (plaintiff is "master to decide what law he will rely upon"; federal jurisdiction was found where the theory of the complaint is not to enforce the licensor's contractual rights but rather to assert remedies for trademark infringement); Mother Waddles Perpetual Mission v. Frazier, 904 F. Supp. 603, 37 U.S.P.Q.2d 1184, 1189 (E.D. Mich. 1995) (court compares the "face of the complaint rule" with the "essence of the complaint" rule, finding federal jurisdiction over a terminated licensee under either rule).

[2.50]Dunlap v. G&L Holding Group, Inc., 381 F.3d 1285, 21 I.E.R. Cas. 1257, 72 U.S.P.Q.2d 1365 11th Cir. 2004) ("[W]hile Dunlap may have to prove ownership of the G and L Bank trademark in accordance with federal law (and we need not decide that issue in this appeal), such a determination would not raise disputed questions of federal law sufficient to confer federal removal jurisdiction.").

[3]Ryan v. Volpone Stamp Co., 107 F. Supp. 2d 369, 376 (S.D.N.Y. 2000) (plaintiff alleged that he terminated the licensing contract and was suing his ex-licensee for Lanham Act violations. Federal jurisdiction was found.). The court applied the rule in Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343, 53 U.S.P.Q.2d 1865 (2d Cir. 2000) (adopting a face of the complaint test for determining subject matter jurisdiction). *Contra*: International Armor & Limousine Co. v. Moloney Coachbuilders, Inc., 272 F.3d 912, 60 U.S.P.Q.2d 1911 (7th Cir. 2001) (even if Lanham Act issues are pleaded, court can re-characterize the dispute as contractual and dismiss it as lacking federal jurisdiction. "[T]hey have tried to frame trademark issues that immediately vanish, a coat of water soluble paint

# TRADEMARK PROTECTION and PRACTICE

## Volume 1

**ANNE GILSON LALONDE**
*Member of the Illinois and District of Columbia Bars*
*and the Bar of the Supreme Court of the United States*

**KARIN GREEN**
*Assistant Editor*
*Member of the Maryland and District of Columbia Bars*

**JEROME GILSON**
**ORIGINAL AUTHOR FROM 1974–2005**
*Shareholder in Brinks Hofer Gilson & Lione,*
*Member of the Illinois Bar and the*
*Bar of the Supreme Court of the United States*

## 2006

*Filed Through:*
RELEASE NO. 60,  OCTOBER 2006

 LexisNexis·

## § 3.06  Assignments

### [1]  Good Will Transfer

A trademark assignment, in order to validly transfer title in the mark, must carry the assignment of the good will which the trademark symbolizes. In other words, a trademark may not be validly assigned apart from its accompanying good will. An assignment without good will, known as an assignment "in gross," does not transfer any legal rights to the assignee.[1] The common law rule requiring assignment of the good will with the mark has been incorporated into Section 10 of the Lanham

---

[1] Bourjois & Co. v. Katzel, 260 U.S. 682, 43 S. Ct. 243, 67 L. Ed. 460 (1923); E. & J. Gallo Winery v. Gallo Cattle Co., 955 F.2d 1327, 21 U.S.P.Q.2d 1824 (9th Cir. 1992) (in assignment and license back good will validly transferred); VISA, U.S.A., Inc. v. Birmingham Trust Nat'l Bank, 696 F.2d 1371, 216 U.S.P.Q. 649 (Fed. Cir. 1982), cert. denied, 464 U.S. 826 (1983) (assignment and license back valid); Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc., 395 F.2d 457, 158 U.S.P.Q. 65 (3d Cir.), cert. denied, 393 U.S. 934 (1968); Adams Apple Distributing Co. v. Papeleras Reunidas, S.A., 773 F.2d 925, 227 U.S.P.Q. 720 (7th Cir. 1985); Haymaker Sports, Inc. v. Turian, 581 F.2d 257, 198 U.S.P.Q. 610 (C.C.P.A. 1978); Liquid Glass Enterprises Inc. v. Liquid Glass Indus. of Canada Ltd., 14 U.S.P.Q.2d 1976 (E.D. Mich. 1989) (assignor retained certain good will); E. Leitz, Inc. v. Watson, 152 F. Supp. 631, 113 U.S.P.Q. 409 (D.D.C. 1957), aff'd, 254 F.2d 777, 117 U.S.P.Q. 13 (D.C. Cir. 1958); SMI Indus. Canada Ltd. v. Caelter Indus., Inc., 586 F. Supp. 808, 223 U.S.P.Q. 742 (S.D.N.Y. 1984); Greenton, Inc. of Cincinnati v. Greenlawn, Inc., 542 F. Supp. 890, 217 U.S.P.Q. 790 (S.D. Ohio 1982); Hough Mfg. Corp. v. Virginia Metal Indus., Inc., 453 F. Supp. 496, 203 U.S.P.Q. 436 (E.D. Va. 1978) (assignment from bankruptcy trustee invalid).

Similarly, a purported assignment of the right to sue for trademark infringement is invalid. National Licensing Ass'n v. Inland Joseph Fruit Co., 361 F. Supp. 2d 1244, 1255-56 (E.D. Wash. 2004) (finding that purported assignee of ability to sue for trademark infringement lacked ownership interests in the mark and consequently lacked standing to sue); International Society for Krishna Consciousness of Western Pa., Inc. v. Stadium Authority of the City of Pittsburgh, 479 F. Supp. 792, 204 U.S.P.Q. 660 (W.D. Pa. 1979). See § 11.02[1][e].

A judgment creditor was not allowed a forced sale of the debtor's trademark rights, inasmuch as the public would be deceived by a different musical group using the same name. A trade name in gross is not "property" which is subject to levy and sale under New York law. Marshak v. Green, 746 F.2d 927, 223 U.S.P.Q. 1099 (2d Cir. 1984). But in Adams Apple Distributing Co. v. Papeleras Reunidas, S.A., 773 F.2d 925, 227 U.S.P.Q. 720 (7th Cir. 1985), the court held that a lien could be placed on a trademark and the mark sold at an involuntary judicial sale. See In the Matter of Roman Cleanser Co., 43 B.R. 940, 225 U.S.P.Q. 140 (E.D. Mich. 1984) (security interest in trademark governed by Uniform Commercial Code; security interest valid).

Act.[2]

## [2] Assignment versus License

A trademark assignment, which transfers title in the mark, must be distinguished from a trademark license, which does not.[3] A trademark license typically grants the licensee permission to use the trademark under certain circumstances, including suitable control of quality, but the licensor does not part with ownership of the mark.[4] At the expiration of the license term the licensor typically regains his exclusive use of the trademark. A valid assignment, on the other hand, transfers ownership of the mark to the assignee, who thereafter may assert exclusive rights of his own. Whether a particular document is effective as an assignment or merely a license depends upon its terms and upon the intention of the parties. The fact that a document is entitled "license" is not controlling. In one case, for example, the court held that an exclusive and irrevocable right to use a trademark in a particular territory was an assignment and not merely a license.[5] In another case, an "exclusive license to use" certain trademarks operated as an assignment where it involved the right to use

[2] 15 U.S.C. § 1060; Mr. Donut of America, Inc. v. Mr. Donut, Inc., 418 F.2d 838, 164 U.S.P.Q. 67 (9th Cir. 1969). See Kardex Systems, Inc. v. Sistemco N.V., 583 F. Supp. 803, 221 U.S.P.Q. 977 (D. Me. 1984) (assignment with good will upheld).

[3] Jones v. Pepsi-Cola Co., 223 F. Supp. 650, 142 U.S.P.Q. 212 (D. Neb. 1963); Acme Valve & Fittings Co. v. Wayne, 386 F. Supp. 1162, 183 U.S.P.Q. 629 (S.D. Tex. 1974).

One court blurred this distinction in analyzing the question of whether a nonexclusive trademark licensee had standing to prosecute an infringement action in his own name. In holding that he did not, the court reasoned that Section 32(1) allowed a "registrant" to sue, that Section 45 empowers an assignee of the registrant to do so, and that "an *exclusive* licensee is an assignee" (emphasis by the court). However, a *nonexclusive* licensee was not an assignee. Quabaug Rubber Co. v. Fabiano Shoe Co., 567 F.2d 154, 195 U.S.P.Q. 689 (1st Cir. 1977).

[4] See Moore Business Forms, Inc. v. Ryu, 960 F.2d 486, 22 U.S.P.Q.2d 1773 (5th Cir. 1992) (oral permission to use mark not a naked license but a consent to use). See § 3.06[6] *infra.*

[5] Ste. Pierre Smirnoff, Fls., Inc. v. Hirsch, 109 F. Supp. 10, 96 U.S.P.Q. 168 (S.D. Cal. 1952).

By contrast, "grant, bargain, and sell" were interpreted in light of the intent of the parties to effect not an assignment but a license of the particular trade name. Edwin K. Williams & Co. v. Edwin K. Williams & Co.-East, 542 F.2d 1053, 191 U.S.P.Q. 563 (9th Cir. 1976), *cert. denied,* 433 U.S. 908 (1977). See Abraham Zion Corp. v. Lebow, 761 F.2d 93, 226 U.S.P.Q. 104 (2d Cir. 1985) (contract interpreted not to constitute assignment).

(Rel. 60-10/2006   Pub.726)

## CERTIFICATE OF SERVICE

I hereby certify that copies of the within Memorandum in Opposition to Preliminary Injunction and to Confirmation of Order of Seizure were served by overnight courier service upon the below listed attorneys and parties on February 15, 2007.

Po W. Yuen
Attorney for Plaintiff
Yuen & Yuen
132 Nassau Street
Suite 1300
New York, NY 10028

Favor Food, Inc
Defendant Pro Se.
22 ½ Catherine Street
New York, NY

W. J. Inc.
Defendant Pro Se
125 Canal Street
New York, NY 10022

Xian Feng Zou
Attorney for A & C Supermarket
39-15 Main Street
Flushing, NY 11354

Dated: New York, NY
February 16, 2007

s/ James N. Blair

_____
James N. Blair JB 6745