UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

PRINCE OF PEACE ENTERPRISES, INC.,

                              Plaintiff,

      -against-

TOP QUALITY FOOD MARKET, LLC, et al.,

                         Defendants.

---------------------------------------------------------------

07 Civ. 00349 (RJH) (FM)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

      Two matters in this case are currently pending before the Court.

      First is defendants A & C Supermarket, Inc. ("A&C"), Tu Chin Lin, Xuiyan Huang, and Yinghai Shi's (collectively the "A&C defendants") motion to dismiss plaintiff Prince of Peace Enterprises, Inc.'s ("POP") first amended complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6); as well as to compel a return of all goods seized by POP; and in support of the A&C defendants' counterclaim for damages as a result of that seizure pursuant to Section 34(d)(11) of the Lanham Act. The A&C defendants argue that POP lacks standing to sue on all of its claims, that additionally POP fails to establish the likelihood of confusion element of its false designation and description claims, and that the A&C defendants lost sales as a result of POP's seizure and publication of that event. The motion, filed on May 1, 2007, is not opposed by POP.[1] Because POP alleges neither that it was the registrant, owner, or legal assignee of the trademarks in question, nor that the goods were materially different from POP's goods

---

[1] POP's opposition papers were due on May 15, 2007. Local Civil Rule 6.1(b). No opposition papers were filed. On October 13, 2010, the Court entered an order directing POP to advise the Court as to whether it consented to dismissal. Pop failed to respond.

sold in the United States, the Court GRANTS the A&C defendants' motion to dismiss POP's complaint in its entirety.  The Court also orders POP to release to the A&C defendants any goods seized from them.  Finally, the Court refers this matter to Magistrate Judge Frank Maas to perform an inquest to determine the appropriate award of damages the A&C defendants incurred due to POP's seizure plus a reasonable attorney's fee, in any.

Second is POP's motion to enforce its settlement agreement with defendant/counterclaimant Madison One Acme Inc., d/b/a Solstice Medicine Co. ("Solstice").  POP contends that Solstice breached an agreement settling all claims between POP and Solstice by engaging in selling activity and obtaining distributorship rights regarding Po Chai Pills ("PCP") in violation of certain timing terms in that agreement.  Solstice contends that POP misreads the settlement agreement, that no enforceable agreement existed in the first place, and that POP cannot make out a claim for damages.  Because the purported settlement agreement contains ambiguous and contradictory terms, of which the parties have contradictory but reasonable interpretations, the Court finds that the parties never came to any meeting of the minds and that therefore the settlement is unenforceable.  The Court thus DENIES POP's motion to enforce its settlement.

## I.  BACKGROUND

### A.  Factual and Procedural Setting

POP brought this action on January 16, 2007.  The FAC, filed March 9, 2007, states claims against, *inter alia*, the A&C defendants and Solstice for: (1) trademark

infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) false

designation of origin and false descriptions and representations under Section 43(a) of the

Lanham Act, 15 U.S.C. § 1125(a); (3) trademark dilution under Section 43(c) of the

Lanham Act, 15 U.S.C. § 1125(c); (4) trademark dilution under Section 360-l[2] of the

New York General Business Law, N.Y. Gen. Bus. Law § 306-l; and (5) New York

common law unfair competition.  (FAC ¶¶ 47-67.)  After denying the allegations in the

complaint, Solstice commenced its own action against POP in federal court in California

asserting several unfair competition claims of its own.  (POP's Mem. in Support of POP's

Mot. to Enforce Settlement ("POP's Enforcement Mem.") at 3.)  That action was

subsequently transferred to this district and consolidated with this action.  (*Id*.)

As of 2004, POP was the "exclusive distributor" of PCP in the United States.

(FAC ¶ 7; FAC Ex. B.)  In or before January 2007, however, POP found products bearing

a mark identical to that affixed to the bottles of their PCP being sold at various markets

including at A&C.  (*Id*. ¶ 32.)  On January 17, 2007, the Court granted POP's application

for an *ex parte* order for seizure of the allegedly infringing goods.  (*Id*. ¶ 37.)  POP

executed that order and seized allegedly infringing products from A&C on January 28,

2010, and publicized the seizure in a Chinese language newspaper.  (Lin Aff. ¶¶ 3, 10.)[3]

---

[2] Though the FAC invokes Section 368-d of the Gen. Bus. Law, that section was replaced by Section 360-l. *See Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F. Supp. 2d 355, 360 (S.D.N.Y. 2003).  There is no substantive difference between the sections.

[3] The publication was allegedly made in The World Journal.  (Lin Aff. ¶ 10.)  The World Journal is a daily Chinese-language newspaper distributed throughout the United States and Canada.  World Journal: About Us, WORLD JOURNAL, http://www.worldjournal.com/about_us-e (last visited Dec. 10, 2010).

**B.  Facts Relevant to the A&C Defendants' Motion to Dismiss and Counterclaim for Damages**

On February 16, 2007, the Court held a hearing to ascertain whether the facts that gave rise to the original issuance of the seizure order were still valid, and to consider the A&C defendants' claim for damages arising out of the allegedly wrongful seizure. *Prince of Peace Enters., Inc. v. Top Quality Food Market, LLC*, No. 07 Civ. 00349 (RJH), 2007 WL 704171, at *1 (S.D.N.Y. Mar. 7, 2007).  The Court found that POP had not proven a likelihood of success on the merits for its claims against the A&C defendants, and vacated the seizure order as to them.  *Id.* at *6.  The Court also found that the A&C defendants had not provided documentation supporting their damages claims but granted them leave to assert counterclaims for damages.  *Id.*  On April 20, 2007, the A&C defendants filed their answers to the FAC, and included a counterclaim under Section 34(d)(11) of the Lanham Act, 15 U.S.C. § 1116(d)(11), for damages incurred from a wrongful seizure.  Then on May 1, 2007, the A&C defendants filed the present motion to dismiss the complaint and in support of their claim to damages.

In the FAC, POP claims to be the "exclusive distributor" of the PCP in the United States (FAC ¶ 7), and also the "assignee" of the trademarks "use[d] for many years on and in connection with" PCP (the "Marks").[4]  (*Id.* ¶¶ 26, 28.)  The assignment was allegedly created by an agreement between a company called Li Chung Shing Tong (S) Pte Ltd. ("LCST") and POP dated April 30, 2004.  According to the agreement, "LCST [was] the owner of various Quinwood Limited U.S. registered Trademarks related to [PCP]."  (FAC Ex. B.)  Quinwood Limited LLC ("Quinwood") was the registrant of the trademarks in question.  (FAC Ex. A at 3, 5, 8, 10, 12.)  The agreement stated:

---

[4] The Marks bear registration numbers 3065427, 3122730, 31227279, 2537896, and 1840260.  (FAC ¶ 26.)

4

> LCST grants POP the Sole and Exclusive use of various Quinwood
> Limited Trademarks owned by LCST related to [PCP] for the [United
> States] to take any and all actions against any and all parties, known and
> unknown, to the fullest extend [sic] of the laws of the [United States].

(FAC Ex. B.)  The agreement also appointed POP the "Sole and Exclusive Authorized

Distributor" of PCP in the United States, and tasked POP with promoting the sale and

ensuring the quality of PCP.  (*Id*.)  Finally, the agreement would "remain valid until

terminated by written notice to the Trademark Office of the [United States]."  (*Id*.)


**C.  Facts Relevant to POP's Motion to Enforce the Settlement Agreement**

On February 1, 2008, POP and Solstice executed a handwritten agreement (the

"Settlement Agreement") on Hilton Hotel stationary purportedly settling the action and

dismissing all claims as between POP and Solstice.  (Seltzer Decl. Ex A ("Settlement

Agreement"); Yeung Aff. ¶ 3; So Decl. ¶ 4.)  The Settlement Agreement was signed by

Kenneth Yeung, founder and president of POP, and Wina So, CEO of Solstice.

(Settlement Agreement; Yeung Aff. ¶ 3; So Decl. ¶¶ 4, 13.)  Relevant to this opinion, the

agreement states:

> 2.  Madison One not to sell PCP nor attempt to obtain distributorship from
> LCST for ~~6th 6th~~ 6 months after termination of POP current or extended
> distributorship.
> 3.  Madison One can sell after ~~period~~ termination of distributorship
> mentioned in ¶ 2.

(Settlement Agreement ¶¶ 2, 3.)  The parties do not disagree that the relevant

"distributorship" ended June 30, 2009.  (Yen Aff. ¶ 3; So Decl. ¶ 10.)  Nor does Solstice

refute POP's contention that it sold PCP between July and November, 2009, well within

six months after the distributorship terminated.  (Yen Aff. ¶¶ 5-11; *see* Solstice's Opp'n

at 5-6.)  Solstice also admits LCST offered and Solstice accepted a distributorship within

the prohibited six-month period following termination of POP's distributorship, but contends that paragraph "3." of the Settlement Agreement prohibited Solstice merely from *soliciting* such an arrangement and not from *accepting* a distributorship unilaterally offered to it.  (Solstice Opp'n at 5-6.)  On March 15, 2010 POP filed the present motion to enforce the Settlement Agreement.

## II.  DISCUSSION

### A.  The A&C Defendants' Motion to Dismiss the FAC

#### 1.  Standard of Review

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.  *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 692 (2d Cir. 2009).  The complaint's allegations, however, "must be enough to raise a right of relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Only a "plausible claim for relief survives a motion to dismiss." *LaFaro v. New York Cardiothoracic Group, PLLC*, 570 F.3d 471, 476 (2d Cir. 2009). Thus courts are "not bound to accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009) (internal quotation marks omitted).

### 2.   POP Has No Standing to Bring Its Federal Trademark Infringement Claim

The A&C defendants argue that POP lacks standing to bring its federal infringement claim because it is not the assignee of the Marks.  They are correct.  Section 32(1) of the Lanham Act allows only a "registrant" to bring a civil action under that section for any of the forms of trademark infringement made unlawful therein.  15 U.S.C. § 1114(1) ("Any person who shall, without the consent of the *registrant* . . . [commit any of several infringement offenses] shall be liable *in a civil action by the registrant* for the remedies hereinafter provided.") (emphasis added).  "Registrant" includes the registrant's "legal representatives, predecessors, successors, and assigns," *id*. § 1127 (defining "registrant"); however, only when the assignment is valid under the Lanham Act does the assignee gain the right to bring a civil action.  *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 623 F.3d 61, 68 (2d Cir. 2010).[5]  In addition to the requirements for assignment under contract law, assignment of a trademark under the Lanham Act requires (1) sale or transfer of *all* rights in the mark, 3 McCarthy on Trademarks and Unfair Competition § 18:1 (4th ed.); and (2) assignment as well of the business's goodwill connected with the mark's use.  *Evercrete Corp. v. H-Cap Ltd*., 429 F. Supp. 2d 612, 621 (S.D.N.Y. 2006).[6]  This is because "[a] trade name or mark is merely a symbol of goodwill; it has no independent significance apart from the goodwill it symbolizes." *Fitzpatrick v. Sony-BMG Music Entertainment, Inc.*, No. 07 Civ. 2933 (SAS), 2010 WL 3377500, at *2 (S.D.N.Y. Aug. 24, 2010).  "Accordingly, where a trademark is assigned

---

[5] That the United States Patent and Trademark Office recorded the assignment, (FAC Ex. A at 1), is not conclusive evidence that the assignment was valid.  *Spirits Int'l*, 623 F.2d at 68.

[6] "Good will is the value attributable to a going concern apart from its physical asserts-the intangible worth of buyer momentum emanating from the reputation and integrity earned by the company."  *Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286, 310 (S.D.N.Y. 2000).

'in gross,' without its accompanying goodwill, the assignment is invalid." *Id*; *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 70 (2d Cir. 2008) ("An assignment 'in gross' is a purported transfer of a trademark divorced from its goodwill, and it is generally deemed invalid under U.S. law.").

The FAC and the agreement POP relies on to support its alleged assignment do not support the inference of a valid assignment.  First, the LCST-POP agreement reads more as a license, or limited permit, to use the Marks than a sale of all the rights in them. An assignment of a trademark is only valid when it includes "all rights in that mark."  3 McCarthy § 18:1.  On the other hand, licenses for particular uses, or other documents not purporting to transfer *ownership* in the mark, are not assignments as the alleged assignor has not parted with all rights.  *Id.*; *see also Gruen Mktg. Corp. v. Benrus Watch Co., Inc.*, 955 F. Supp. 979, 982-83 (N.D. Ill. 1997) ("[Plaintiff's] argument, however, does not overcome the express language of the License Agreement that [defendant] retained ownership of the BENRUS mark.  A licensee lacks standing where the agreement indicates that the licensor retains exclusive ownership of the mark." (citing *DEP Corp. v. Interstate Cigar Co., Inc.,* 622 F.2d 621, 623 (2d Cir.1980)).  Specifically, when an agreement places obligations regarding the trademark on the alleged assignee and indicates that the trademark is owned not by the assignee but by the assignor, a court should read that agreement as a license and not as an assignment.  *Calvin Klein Jeanswear Co. v. Tunnel Trading*, 98 Civ. 5408 (THK), 2001 WL 1456577, at *4-5 (S.D.N.Y. Nov. 16, 2001).  Here the agreement (1) tasks POP with several obligations concerning resale of PCP; and (2) more importantly, states explicitly that "LCST is the owner of [the Marks]," and that LCST grants POP the "use" of the Marks "owned by

LCST." (FAC Ex. B.) In other words, LCST *owned* the Marks, and nothing indicates that LCST has ceased owning them despite its agreement with POP. If anything the agreement suggests the opposite. If LCST had relinquished all rights in the Marks, as is required for an assignment of trademark rights, 3 McCarthy § 18:1, then it is bizarre (1) that POP would as consideration undertake obligations to, *inter alia*, ensure PCP's quality; and (2) that the agreement would anticipate and provide a method for its own termination. (FAC Ex. B.) Thus, as the beneficiary of a license agreement, and not of an assignment of ownership rights, POP lacks standing to bring its infringement claim. *Brooklyn Bottling of Milton, New York, Inc. v. Ecuabeverage Corp.*, No. 07 Civ. 8483 (AKH), 2008 WL 577288, at *2 (S.D.N.Y. Mar. 3, 2008) (finding no assignment when agreement in question granted right to use a trademark but stated explicitly that the registrant was the "owner" of the mark).

Second, nothing in the FAC or documents referenced therein suggests that LCST ceased its own sales of PCP, and thus that LCST had transferred *all* of the goodwill connected to the Marks with the rights to use them. *Cf. Clark & Freeman Corp. v. Heartland Co. Ltd.*, 811 F. Supp. 137, 139 (S.D.N.Y. 1993) (discussing not only that post-assignment continuation of operations suggests a non-transfer of goodwill, but also that even post-assignment cessation of operations does not, alone, suffice to indicate that transfer). Without an indication that LCST ceased its own operations selling PCP, LCST cannot have transferred to POP all of its goodwill in the Marks. Furthermore, though a trademark's owner is not necessarily required to transfer all the physical assets of his business connected to the mark, the assignee must still demonstrate (1) that its business "go[es] on in real continuity" with the assignor's business; and (2) that the assignor has

9

divested himself of his trademark rights and business activity involving the mark.  *See Fitzpatrick*, 2010 WL 3377500, at *3.  Even if POP could prove the former through, perhaps, being the exclusive distributor of PCP, nothing in the FAC indicates, at all, that LCST divested itself of its business involving the mark.

The FAC states: "Plaintiff is the assignee of the [Marks]."  (FAC ¶ 26.)  However, in assessing a complaint on a motion to dismiss, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 129 S. Ct. at 1949.  The Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Twombly*, 550 U.S. at 555.  Because POP has not alleged facts allowing the Court to determine, as is required, that POP was plausibly the assignee of the Marks, *see Iqbal*, 129 S. Ct. at 1950, POP does not adequately allege it has standing to bring its federal infringement claim.  Thus that claim must be dismissed.

**3.  POP Has No Standing to Bring Its Federal or State Trademark Dilution Claims**

POP also fails to properly allege standing to bring its federal and state dilution claims for a similar reason:  it is not the owner of the Marks.  Section 43(c) of the Lanham Act allows only "*the owner of a famous mark*," to "be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution."  15 U.S.C. § 1125(c)(1) (emphasis added).  Likewise, "[t]o establish a trademark dilution claim under [New York Gen. Bus. Law § 360-l], [plaintiff] must show *ownership of a distinctive mark* and a likelihood of dilution."  *Empresa Cubana del Tabaco v. Culbro*

*Corp.*, 399 F.3d 462, 485-86 (2d Cir. 2005) (citing *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 966 (2d Cir.1996)) (emphasis added).  Standing for POP's federal and state dilution claims thus requires that the POP be the owner of the mark in question. *See Iconix Brand Grp., Inc. v. Bongo Apparel, Inc.*, No. 06 Civ. 8195 (DLC), 2008 WL 2695090, at *5 (S.D.N.Y. July 8, 2008); *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Corp.*, 937 F. Supp. 204, 209 (S.D.N.Y. 1996) ("The first requirement for a claim of dilution is ownership of a famous mark.")  Nothing in the FAC, however, states or suggests that POP is the owner of the five trademarks allegedly infringed.  As noted, the document POP relies on to establish an assignment states: "LCTS is the *owner* of various Quinwood Limited U.S. registered Trademarks related to [PCP]. . . . LCST grants POP the Sole and Exclusive *use* of various Quinwood Limited Trademarks *owned* by LCST."  (FAC Ex. B (emphasis added).)  In other words, the FAC states that *LCST* is the owner of the mark in question and shows that POP was at best a licensee or a distributor.  As it is not the owner of the Mark, POP lacks standing under both Section 43(c) of the Lanham Act and under New York Gen. Bus. Law § 360-l.

There is authority suggesting that an exclusive licensee or distributor, as POP claims to be in this case, might have standing to sue under Section 43(c) if the license agreement in question grants the licensee especially strong ownership rights.  In *World Championship Wrestling v. Titan Sports, Inc.*, the court stated:

> [T]he statute only refers to the "owner of a famous mark" in its provisions for relief. [] The only court that has specifically addressed this issue reviewed the provisions of the licensing contract to determine what the nature of the licensee's ownership rights in the trademark were and held that "plaintiff, as the exclusive licensee but not the owner of the marks at issue . . ., lacks standing to pursue a claim under 15 U.S.C. Sec. 1125(c)." *See STX, Inc. v. Bauer USA, Inc.*, No. C 96-1140 FMS, 1997 WL 337578, at *3-4 (N.D. Cal. June 5, 1997).  Although the court's determination of

11

> this issue is persuasive, its holding was based on a fact-specific review of the licensing agreement in relation to a motion for summary judgment.  If plaintiff can show that its licensing agreement with the wrestlers provides greater ownership rights in their marks than the one at issue in *STX*, plaintiff may have standing to assert this claim.

46 F. Supp. 2d 118, 122 (D. Conn. 1999).  This Court respectfully disagrees.  As the *STX* decision, cited in *Titan Sports*, properly notes:

> Nothing in the Lanham Act suggests that "owner" in § 1125(c)(1) includes by definition anything other than the actual owner of the famous mark.  The question whether an exclusive licensee, rather than an "owner," would have standing to pursue a claim under 15 U.S.C. § 1125(c)(1) is one of first impression.  Plaintiff would like the Court to define "owner" loosely as anyone who possesses a right that would be recognized and upheld in court.  The Lanham Act itself, however, suggests that when Congress desires to give non-owners the right to bring legal action under the Act, it says so.

*STX, Inc. v. Bauer USA, Inc.,* No. C 96-1140 FMS, 1997 WL 337578, at *4 (N.D. Cal. June 5, 1997) (emphasis added).  Indeed, this district requires that one either be the owner or the registrant of the mark in question to have standing under Section 43(c) and New York Gen. Bus. Law § 360-l.  *See Iconix*, 2008 WL 2695090, at *5 ("[Plaintiff] concedes that it is 'neither the "registrant" nor the owner' of the Bongo mark, and thus that it does not have standing to pursue its claims for . . . dilution under 15 U.S.C. § 1125(c)."  Absent a valid assignment transferring all ownership rights in a mark, even an exclusive licensee and distributor, as plaintiff here claims to be, (*see* FAC ¶¶ 7, 29), is not a mark's "owner" for purposes of Section 43(c).  *ICEE Distributors, Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 599 (5th Cir. 2003).  Finally, even if *Titan Sports*' interpretation were correct, that possibility still would not help POP as the license agreement here states explicitly that LCST is the "owner" of the marks and that LCST is merely granting POP the "use" of those marks.

POP has not alleged facts allowing the Court to determine, as is required, that POP was plausibly the owner of the Marks. *See Iqbal*, 129 S. Ct. at 1950. POP, in fact, does not allege at all that it was the Marks' owner. POP thus does not adequately allege it has standing to bring its federal and state dilution claims, and those claims must be dismissed.

## 4. POP Has Not Adequately Alleged that A&C's PCP Was Materially Different from Its Own

Section 43(a) of the Lanham Act, unlike Sections 32(1) or 43(c), does not require that plaintiff be the registrant, valid assignee, or owner of the trademark in question. Instead, that section allows a civil action by "any person who believes that he or she is or is likely to be damaged" by the conduct made unlawful thereunder. 15 U.S.C. § 1125(a)(1). Nevertheless, POP fails to state a claim under Section 43(a) because the FAC does not allege that the PCP bearing the infringing mark, which in this case is a so-called "gray good," differs in any way from POP's PCP.

Section 43(a) provides in relevant part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). When the mark in question is affixed to a "gray good"—that is a good allegedly unauthorized for sale in the relevant market but bearing the

manufacturer's actual trademark—courts employ a two part test for determining whether that likelihood of confusion exists.[7]  *Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 308 (S.D.N.Y. 2007).  A likelihood exists when (1) the goods were not intended to be sold in the market in question, *and* (2) the goods are materially different from the goods typically sold in that market under the mark.  *See Novartis Animal Health US, Inc. v. Abbeyvet Export Ltd.*, 409 F. Supp. 2d 264, 266 (S.D.N.Y. 2005).[8]  On the other hand, when no material difference exists between the goods in question, then the mere unauthorized sale of the trademarked good does not create an actionable likelihood of confusion.  *Dan-Foam*, 500 F. Supp. 2d at 310.

Though the standard for finding a material difference is low, and perhaps even "'require[es] no more than showing that consumers would be likely to consider the differences between the [two] products to be significant when purchasing the product,'" *Dan-Foam*, 500 F. Supp. 2d at 312 (quoting *Bourdeau Bros., Inc. v. Int'l Trade Comm'n*, 444 F.3d 1317, 1324 (Fed. Cir. 2006) (applying that material difference test in a Tariff Act case)), plaintiff here cannot satisfy even that standard as the FAC fails to allege that the goods in question were different at all.  If anything the FAC indicates that the products were equivalent.  (*See* FAC ¶ 36 ("Plaintiff has on January 28, 2007 entered the place of business of Defendant A & C Supermarket, Inc. and found infringing Po Chai Pills products bearing the Plaintiff's registered Trademark.").)  Indeed, POP has represented to this Court that it accepts that the allegedly wrongfully marketed PCP was

---

[7] When dealing with a non-gray good, a court will apply the nine-factor "Polaroid" test to determine whether a likelihood of confusion exists.  *Novartis Animal Health US, Inc. v. Abbeyvet Export Ltd.*, 409 F. Supp. 2d 264, 266 (S.D.N.Y. 2005).

[8] This test is applicable for "gray goods" because in such a situation the fear is not consumer confusion regarding the manufacturer of the good, but is instead that "consumers may unwittingly purchase the goods on the basis of the [licensed] markholder's reputation only to be disappointed when the product does not meet their expectations."  *Zip Int'l Grp., LLC v. Trilini Imports, Inc.*, No. 09-CV-2437 (JG), 2010 WL 648696, at *3 (E.D.N.Y. Feb. 22, 2010).

14

actually manufactured by LCST and that the ingredients in that PCP and its own were the same.  *See Prince of Peace*, 2007 WL 704171, at *4-5; (Hr'g of Feb. 16, 2007 at 5, 9). The A&C defendants' PCP was thus not materially different from POP's and POP's claim under Section 43(a) of the Lanham Act must be dismissed.


### 5.  POP's Remaining Claim for State Law Unfair Competition Is Dismissed

"Federal courts have supplemental jurisdiction over state law claims 'that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.'" *DCML LLC v. Danka Business Systems PLC*, No. 08 Civ. 5829 (SAS), 2008 WL 5069528, at *3 (S.D.N.Y. Nov. 26, 2008) (quoting 28 U.S.C. § 1367(a)) (alteration in original).  Though a court's exercise of that jurisdiction is discretionary, when "all federal claims have been dismissed before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the state-law claims."  *Id.* (alteration in original) (internal quotation marks omitted).  Because all of POP's federal claims have been dismissed as against the A&C defendants, as well as POP's state law dilution claim, the Court declines to exercise jurisdiction over POP's New York common law unfair competition claim and dismisses that claim.

**6.  The A&C Defendants' Claim for Damages Is Granted, and the Matter Is Referred to the Magistrate Judge for a Damages Inquest; POP Is Ordered to Return All Seized Goods**

Under Section 34(d)(11) of the Lanham Act, "[a] person who suffers damage by reason of a wrongful seizure under this subsection has a cause of action against the applicant for the order under which such seizure was made, and shall be entitled to recover such relief as may be appropriate."  15 U.S.C. § 1116(d)(11).  A party seeking damages under Section 34(d)(11) must establish (1) that it was the victim of an ex parte seizure; (2) that it was damaged by that seizure; and (3) either (a) that the seized goods were predominantly non-infringing or were otherwise legitimate merchandise, or (b) that the party seeking the seizure did so in bad faith.  *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of America Co.*, 195 F.3d 765, 773 (5th Cir. 1999) (citing S. Rᴇᴘ. Nᴏ. 98-526, at 8 (1984)); 5 McCarthy § 30:44.

The A&C defendants have alleged the first and second elements required for damages under Section 34(d)(11); they were the victims of an ex parte seizure (A&C Defendants' Answer ¶ 8; Lin Aff. ¶¶ 3, 5), and that seizure caused damages.  (Lin Aff. ¶ 6.)  Furthermore, the seized goods were non-infringing.  The Court here holds, *inter alia*, that POP has no standing to assert its infringement claims; in other words, POP had no federal trademark right which it could have enforced following an allegedly wrongful use of the Marks.  *See Calvin Klein Jeanswear*, 2001 WL 1456577, at *4.  Thus the PCP seized from A&C did not infringe upon any trademark rights held by POP, and the A&C defendants are entitled to damages under Section 34(d)(11).

The A&C defendants claim damages resulting from lost sales, spoiled merchandise, and wages paid during the time that POP physically executed the seizure, and also claim attorney's fees.  (Lin Aff. ¶¶ 5-9.)  Defendants also claim they "suffered substantial harm to [] goodwill," and request, additionally, punitive damages.  (A&C Def.'s Mem. at 8.)  As documentary evidence to support these figures, the A&C defendants submit, *in toto*, (1) a two-line chart purporting to demonstrate the difference in their revenues between January 21, 2007, and January 28, 2007, the date of the seizure; and (2) the dairy entries of their lawyer, Xian Feng Zou, detailing the work he performed on this case.  However, because the Court cannot, merely from the chart submitted, determine the existence or extent of damages with accuracy (indeed, defendants make no proffer at all going to the value of their loss of good will), the Court refrains from issuing any damages award at this time and instead refers this matter to Magistrate Judge Frank Maas for a damages inquest.

The A&C defendants are also entitled to return of any seized goods as the Court's decision of March 6, 2007, vacated POP's seizure order with respect to A&C.  *Prince of Peace*, 2007 WL 704171, at *6.  To the extent that any goods POP seized from the A&C defendants have yet to be returned, POP is hereby directed to release those goods to the A&C defendants.

## B.  POP's Motion to Enforce the Settlement Agreement

### 1.  New York Law Governs the Dispute

Preliminarily, the Court notes that a question exists concerning what law governs the Settlement Agreement.  Under New York's choice-of-law rules, "the interpretation

17

and the validity of contracts are determined by the law of the place where the contract is made, while all matters connected with its performance are regulated by the law of the place where the contract, by its terms, is to be performed." *TSR Silicon Resources Inc. v. Broadway Com Corp.*, No. 06 Civ. 9419 (NRB), 2007 WL 4457770, at *3 (S.D.N.Y. Dec. 14, 2007) (quoting *Auten v. Auten,* 308 N.Y. 155, 160, 124 N.E.2d 99, 101 (1954)). Though neither party proffers evidence of where the Settlement Agreement was signed, POP's Memorandum of Law suggests that signing occurred in California.  (*See* POP's Enforcement Mem. at 11 ("It should be briefly noted that there is no issue as to conflict of laws, as California law applies the same standard[s].").)  However, the parties have consented to application of New York law by briefing all issues under the law of new York.  *See In re Cross Media Marketing Corp.*, 367 B.R. 435, 453 (Bankr. S.D.N.Y. 2007) (finding New York law consented to on "all of the state law causes of action alleged [because] [n]one of the parties raised any choice of law issues in the pleadings [and] . . . [f]or the most part, the parties briefed the issues applying New York law."). Regardless, as the law regarding the formation of an enforceable agreement is the same in both jurisdictions, the outcome would be unchanged under California law.  *Compare Tyco Thermal Controls LLC v. Redwood Indus.*, No. C 06-7164 JF (PVT), 2010 WL 3211926, at *8 (N.D. Cal. Aug. 12, 2010) ("A settlement agreement, like any other contract, is unenforceable if the parties fail to agree on a material term.") *with Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006) ("The fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties, and, if there is no meeting of the minds on all essential terms, there is no contract.").

## 2.  No Enforceable Agreement Was Formed

Like all contracts, "[a] settlement agreement is a contract that is interpreted according to general principles of contract law."  *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005).  To maintain a breach of contract under New York law, a party must establish "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach."  *RCN Telecom Servs., Inc. v. 202 Centre Street Realty LLC*, 156 Fed. Appx. 349, 350-51 (2d Cir. 2005).  Existence of a contract requires "an offer, acceptance, consideration, mutual assent and intent to be bound."  *Benicorp*, 447 F. Supp. 2d at 337. Mutual assent requires, in turn, "a meeting of the minds of the parties, and, if there is no meeting of the minds on all essential terms, there is no contract."  *Id*.  Indeed, "[i]f the Court finds substantial ambiguity regarding whether both parties have mutually assented to all material terms, then the Court can neither find, nor enforce, a contract."  *Id.* (citing *Schurr v. Austin Galleries of Illinois, Inc.*, 719 F.2d 571, 576 (2d Cir. 1983).  An ambiguity exists when "the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Law Debenture Trust Co. of New York v. Maverick Tube Co.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted).  On the other hand, a contract "is unambiguous when it has a definite and precise meaning and where there is no reasonable basis for a difference of opinion."  *Klos v. Lotnicze,* 133 F.3d 164, 168 (2d Cir.1997).

In construing settlement agreements, if ambiguities are created by the contract's language, then the court may look to the parties' statements and submissions to resolve the ambiguity by determining the parties' understandings of the ambiguous terms. *Gessin Elec. Contractors, Inc. v. 95 Wall Assocs., LLC*, 903 N.Y.S.2d 26, 28 (N.Y. App. Div. 2010). When the parties understand the relevant language differently and both understandings are reasonable, however, the contract will be unenforceable as no meeting of the minds has occurred. *Computer Assocs. Int'l Inc. v. U.S. Balloon Mfg. Co.*, 782 N.Y.S.2d 117, 119 (N.Y. App. Div. 2004). Thus, "[e]ven if the parties intend to be bound by a contract, it is unenforceable if there is no meeting of the minds, i.e., if the parties understand the contract's material terms differently." *Gessin*, 903 N.Y.S.2d at 28. The burden of establishing that the parties reached a meeting of the minds is on the party seeking to enforce the settlement. *Benicorp*, 447 F. Supp. 2d at 337.

The Settlement Agreement here suggests two contradictory meanings and is therefore facially ambiguous. Paragraph "2." prohibits Solstice from selling PCP for "6 months after termination of POP current or extended distributorship." (Settlement Agreement ¶ 2.) Yet paragraph "3." permits Solstice to sell PCP after "termination of distributorship mentioned in ¶ 2." (*Id.* ¶ 3) Thus paragraphs "2." and "3." are at odds; the former prohibits selling during the relevant six months while the latter permits it. Moreover, the parties' alleged understandings of that prohibition or permission are incompatible. POP assures the Court that "POP would not sign a settlement agreement unless it included an additional six (6) months during which Solstice was prohibited from selling PCP." (Yeung Aff. ¶ 5.) Yet Solstice is equally adamant that "[Solstice] would not have agreed to any contract term that prohibited Solstice from selling PCP for a six

month period after termination of POP's distributorship." (So Decl. ¶ 13.) And both

parties' claims as to the contract's meaning are reasonable. It is reasonable that POP

would desire a six month period after the end of its distributorship in which to obtain a

new deal. It is also reasonable that POP's period of exclusive selling terminate with its

exclusive distributorship. And if POP could not obtain a new distributorship in the time

remaining on its then present deal, it seems unreasonable to preclude Solstice from

entering the market after that deal terminated.

POP's argument for harmonizing the conflicting paragraphs is unpersuasive. POP

states:

> Even if the court finds an ambiguity, it should be resolved in POP's favor.
> All terms of a contract should be construed and are assumed to have some
> purpose and meaning attributed to them. Point No. 2 clearly states
> Solstice is 'not to sell PCP [nor attempt to obtain distributorship from
> LCST] for 6 months after termination of POP[']s current or extended
> distributorship." Interpreting Pont No. 3 to permitting [sic] Solstice to sell
> PCP during the six months after termination, will render meaningless the
> provision of Point No. 2 barring Solstice from selling PCP for six months
> after termination of POP's distributorship a nullity.

(POP's Reply at 7 (alterations in original) (internal citations omitted).) Of course, POP

has conveniently failed to recognize that interpreting paragraph "2." to unconditionally

prohibit Solstice from selling within the six month period would likewise "render

meaningless" the permission of that activity made by paragraph "3." Because POP has

offered no further evidence indicating that it and Solstice actually came to a mutual

understanding as to whether Solstice was allowed to sell PCP within six months after

POP's distributorship terminated, no enforceable agreement was ever created.

The *Benicorp* and *Gessin* cases are instructive. In *Benicorp* the district court

found unenforceable a drug supplier's settlement with an insurer. 447 F. Supp. 2d at 340.

The insurer had sued the supplier alleging breaches of the parties' drug supply agreement relating to rebates the supplier would pay the insurer. *Id*. at 332. The parties settled and included in their agreement a release by the insurer of all claims relating to rebates under the supply agreement. *Id*. at 334-35. When the supplier refused to pay rebate claims arising after the execution of the settlement, the insurer sued again. *Id*. at 331. The supplier argued that the settlement agreement operated as a release from *all* claims relating to the rebates, even claims arising after the settlement was executed. *Id*. at 335. The court found that the agreement was ambiguous and contradictory, that both parties' interpretations were reasonable, and that therefore the parties had never reached a meeting of the minds. *Id*. 338-40. *Gessin* presents a similar situation. There a contractor sued an owner for $1.7 million in change orders. *Gessin*, 903 N.Y.S.2d at 27. The parties settled "all change orders" for $500,000, but whereas the owner believed that amount settled the entirety of the contractor's claim, the contractor believed the settlement only accounted for $580,000 of the claim. *Id*. The Appellate Division, First Department affirmed the lower court's determination that the settlement was void, stating:

> [T]he language employed in the contract [is] not susceptible of only one meaning, and thus the contract [is] ambiguous as a matter of law. There was a reasonable basis for the parties' difference of opinion as to what the contract included or did not include, and thus the contract was unenforceable for lack of a meeting of the minds.

*Id*. at 29. As in *Benicorp* and *Gessin*, the prohibitions and permissions created by the contract here are completely at odds, as are the parties' reasonable interpretations. Thus POP's settlement agreement with Solstice is unenforceable, and POP's motion to enforce the settlement agreement is denied.

22

### III.  CONCLUSION

For the reasons stated above, the A&C defendants' Motion to Dismiss is GRANTED, and POP's claims against the A&C defendants are DISMISSED with prejudice.  POP is ORDERED to release to the A&C defendants any goods seized pursuant to the Court's January 17, 2007, ex parte seizure order to the extent those goods have not already been returned.  Judgment is also ENTERED FOR the A&C defendants on their counterclaim for damages; and this matter is referred to Judge Maas for a inquest to determine the amount of damages to which the A&C defendants are entitled.  POP's motion to enforce its settlement agreement with Solstice is DENIED.  The Court will hold a status conference on March 18, 2011, at 10:30 a.m.  ANY PARTY REMAINING IN THIS CASE WHO FAILS TO APPEAR WILL BE FOUND IN DEFAULT AND WILL BE DISMISSED FROM THIS ACTION.

SO ORDERED

Dated: New York, New York
       January 1 2, 2011

_____
Richard J. Holwell
United States District Judge

23